# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.: 2:08-CV-204 PS |
| BP PRODUCTS NORTH AMERICA, INC., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Defendant BP Products North America, Inc. wants to modify its oil refinery in Whiting, Indiana, in order to process Canadian extra heavy crude oil. So it asked the Indiana Department of Environmental Management (IDEM) for a permit. BP requested what Indiana law calls a "minor source" permit because it claimed its modifications would not trigger the more rigorous restrictions of the Clean Air Act. Plaintiff, an environmental group called the Natural Resources Defense Council (NRDC), told the IDEM that it shouldn't grant BP the permit because it believed that BP's modifications would actually cause far more air pollution than BP let on. The NRDC wasn't alone. Several other individuals and groups also raised the same concerns. But the IDEM was satisfied that BP's modifications would not trigger the Clean Air Act's "major source" permit requirements. So it granted BP the minor source permit.

The NRDC's companions filed a petition to review the IDEM's decision in the Office of Environmental Adjudication (OEA), Indiana's agency that handles appeals of that sort. But the NRDC took a different tack. Instead of joining in the appeal to the OEA, the NRDC brought this citizen suit, which alleges that BP is violating the Clean Air Act. The complaint claims that BP

deceived the IDEM as to the actual levels of emissions that will result from its modifications. It also claims that BP actually began modifying the Whiting facility in 2005, well before it obtained *any* permit, which is an independent theory as to how BP is violating the Clean Air Act. The NRDC asks this Court to find that BP violated the Clean Air Act, enjoin BP from making its modifications, require it to go back to the IDEM to get the permits the NRDC thinks BP needs, and to impose civil penalties.

Perhaps not surprisingly, much of the ground covered in the NRDC's complaint is also covered by the petition for review in the OEA. Like the NRDC, the OEA petitioners also claim that BP deceived the IDEM and that consequently the IDEM's decision was erroneous. And they also seek to send BP back to the IDEM to get the more stringent major source permit. That case is now in the home stretch. Discovery has concluded, and the OEA is set to have a *de novo* hearing in August. In this case, by contrast, discovery has not even begun.

BP first contends that I do not have jurisdiction to decide this case. As a backup argument, it contends that I should abstain from hearing the case given that the issues are well along in the parallel state proceeding. While I am satisfied that the Court has jurisdiction, I nevertheless think this case really presents a call to be made by the expert environmental agencies that Indiana has selected for the job. I therefore conclude it is proper for this Court to abstain from exercising its jurisdiction with respect to two of the three counts in the NRDC's complaint. It is, however, appropriate for the Court to hear the NRDC's claims about BP's conduct in 2005, which are the subject of count II. Other than that, though, BP's motion to dismiss is granted.

## STATUTORY AND REGULATORY BACKGROUND

The Clean Air Act is a complex statute designed to control air pollution throughout the nation. After early stumbles, the Act was amended in 1970 to force states to take stronger action to improve air quality. In response to those amendments, the states crafted their own regulatory schemes to meet the requirements of the Act. The resulting system is a tangled web of interconnected federal law, federal regulations, state law, and state regulations, with, for good measure, a case law gloss on top of it all. The briefing in this matter was excellent, but as with most cases interpreting complex regulatory schemes, it was rife with technical jargon, and an abundance of pesky acronyms. I have done my best to simplify the issues. To that end, before I get into the who, what, where, and when of this case, it is probably best to set the scene by briefly describing the regulatory mechanisms that provide the backdrop. I will start with the federal Clean Air Act and then turn to the Indiana system.

The Clean Air Act is intended to protect and enhance the quality of the nation's air. *See* 42 U.S.C. § 7401(b)(1). Originally enacted in 1963, it was part of the federal government's gradual increase in supervision over air quality. *See Train v. NRDC*, 421 U.S. 60, 63-64 (1975). Originally, the federal government maintained a relatively hands-off approach, and the states were left with "wide latitude to determine both the air quality standards which they would meet and the period of time in which they would do so." *Id*. at 64.

That changed with the 1970 amendments, which Congress passed due to dissatisfaction with the progression of existing air pollution programs. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 469 (2004). The 1970 amendments were a reaction by Congress to what it perceived as the serious problem of air pollution and the individual states' inability or

unwillingness to address the problem.  *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976).

Under the amended Act, the EPA established National Ambient Air Quality Standards (NAAQS)

to provide a framework for evaluating the air quality in various locations around the county.  *See*

42 U.S.C. § 7409.  *See also* 40 C.F.R. §50.2.  After the EPA defines the standard, each state must

then designate those areas within its boundaries where the air quality is better or worse than that

standard for each type of pollutant, or where the air quality cannot be classified because of

insufficient data.  *See* 42 U.S.C. § 7407(d).  Areas that meet the standards for a particular

pollutant are classified as "attainment" areas for that pollutant; areas that do not, are classified as

"nonattainment."  *Id.*

Part C of subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-92, sets forth

requirements for the prevention of significant deterioration of air quality in attainment areas.

The goal of course is to ensure that areas that have "clean" air will continue to have it.  So part

C, among other things, prohibits the construction of a "major emitting facility" in an attainment

area unless a permit has been issued that complies with certain requirements of part C, including

the use of the best available control technology for each regulated pollutant that is emitted from

the facility.  *See* 42 U.S.C. § 7475(a).  *See also* 40 C.F.R. §§ 52.21 & 51.166.  Not surprisingly,

refineries such as BP's Whiting facility are "major emitting facilities."  42 U.S.C. § 7479(1).

Furthermore, the Act provides that once a source passes the specified threshold for emission of a

particular pollutant, the source must obtain what is commonly called a "major source permit."

*See* 42 U.S.C. § 7475(a).  *See also* 40 C.F.R. §§ 52.21 & 51.166.

Part D of the Act attempts to improve the air quality in nonattainment areas – that is,

areas where the air quality is already poor as judged by the standards set by the EPA.  *See* 42

4

U.S.C. §§ 7501-15. As with part C, part D also requires major emitting facilities to obtain

permits before undertaking certain modifications. *See* 42 U.S.C. § 7503. And, like part C, part

D also provides thresholds for various pollutants, beyond which a modification is considered to

be "major." *See* 40 C.F.R. § 51.165(a)(1)(x). Prior to commencing a major modification that

triggers part D, one generally must first obtain a major source permit. *See* 42 U.S.C. § 7503.

*See also* 40 C.F.R. 52.21 & 51.165.

Under the Act, states retain "the primary responsibility for formulating pollution control

strategies." *Union Elec.*, 427 U.S. at 256. *See also* 42 U.S.C. § 7410(a). But the Act subjects

"the States to strict minimum compliance requirements." *Union Elec.*, 427 U.S. at 256-57. In

particular, states are responsible for carrying out the Act's provisions through what are called

State Implementation Plans (SIPs). *Id. See also Alaska DEC*, 540 U.S. at 742-43. Each SIP

must satisfy the requirements of the Clean Air Act before they are approved by the EPA. *See* 42

U.S.C. § 7410(k). *See also* 40 C.F.R. §§ 51.165-51.166. States are given wide latitude in

formulating their plans and the EPA must approve them if they have been adopted after public

notice and hearing and if they meet eight specified criteria. *Union Elec.*, 427 U.S. at 249-50.

The federal regulations are only applicable in the absence of an EPA-approved SIP. *See, e.g.*, 42

U.S.C. § 7410; 40 C.F.R. 52.21(a).

Indiana has complied with the Clean Air Act by creating a detailed statutory and

regulatory scheme to implement the Act, as well as various other state and federal environmental

programs. *See* Ind. Code § 13-11-1-1 *et seq.* Indiana's General Assembly expressly noted its

intent to continue a policy of "cooperation with the federal and local governments and other

concerned public and private organizations," to, among other things, "[f]ulfill the social,

5

economic, and other requirements of present and future generations of Indiana citizens." Ind. Code § 13-12-4-3. In other words, Indiana's environmental laws are not only designed to comply with federal requirements, but also to address issues that are of particular importance to the State itself.

Indiana's regulatory system starts with the IDEM, which is the air pollution control agency for Indiana with respect to matters related to the Clean Air Act. *See* Ind. Code § 13-13-5-1. The State has entrusted the IDEM with the power to grant permits and licenses under the Clean Air Act, *see* Ind. Code § 13-14-1-1 *et seq.*, but has also circumscribed the IDEM's freedom to do so by creating a detailed framework for its analysis of permits, *see* Ind. Code § 13-15-3-1 *et seq.* In particular, the State provides for public hearing and comment prior to the IDEM deciding on a permit, *see* Ind. Code § 13-15-3-3 & § 13-15-5-1, specifies the criteria for deciding whether to grant a permit, *see* Ind. Code § 13-15-3-5, gives the IDEM a time frame for deciding on permit applications, *see* Ind. Code § 13-15-4-1(a)(7), and requires the IDEM provide notice of its decision to the parties involved in the application, *see* Ind. Code § 13-15-5-3.

After the IDEM disposes of a permit application, its decisions can be appealed to another administrative agency, the OEA. *See* Ind. Code § 13-15-6-1 *et seq.* *See also* Ind. Code § 4-21.5-7-3. The OEA then applies its own expertise in evaluating the petition *de novo*. *See* Ind. Code §§ 13-15-6-3 & 13-15-7-1 *et seq.* The OEA's decision can then be reviewed in the Indiana state courts. *See* Ind. Code § 4-21.5-5-16. *See also* Ind. Code § 13-15-6-5. Under the Indiana system, any trial court of general jurisdiction can review the OEA's decisions, *see* Ind. Code § 4-21.5-5-6, and the review is conducted under a deferential standard, *see Huffman v. OEA*, 811 N.E.2d 806, 809 (Ind. 2004); *Ind.-Ky. Elec. Corp. v. Comm'r, IDEM*, 820 N.E.2d 771, 776 &

781 (Ind. Ct. App. 2005).

Substantively, Indiana's regulatory regime copies the Clean Air Act's part C and part D restrictions, *see, e.g.*, 326 Ind. Admin. Code 2-3-1 *et seq.*, including the pollutant thresholds, *see* 326 Ind. Admin. Code 2-2-1 (xx) & (yy); 326 Ind. Admin. Code 2-3-1(qq) & (rr), and the concomitant permit requirements, *see* 326 Ind. Admin. Code 2-2-2 & 2-2-3. In addition, for sources that can demonstrate that their emissions will be below the thresholds, Indiana law allows for the source to obtain what is known as a "minor source permit." *See* 326 Ind. Admin. Code 2-7-10.5. Minor source permits do not require the source to use the best available control technology or achieve the lowest emissions rate which are requirements attached to the permits that are necessary when a source triggers parts C and D.

The EPA has approved Indiana's SIP with respect to its implementation of parts C and D of the Clean Air Act. That approval was codified on June 18, 2007. *See* 72 Fed. Reg. 33.395. In addition, the EPA has approved Indiana's minor new source review rules. *See* 62 Fed. Reg. 38.919 (July 21, 1997). As a result, Indiana's state regime controls the analysis of whether to grant BP's permit in this case.

## FACTUAL BACKGROUND

According to the Amended Complaint, which I accept as true at this point, the NRDC is a not-for-profit corporation whose missions is environmental protection. (*See* DE 38 ¶7.) They have thousands members nationwide and several hundred who reside in Lake County, Indiana. (*Id.*) BP operates the refinery in Whiting and, when BP applied for a minor source permit from IDEM to expand the plant, NRDC was one of a number of environmental groups that fought the request. (*Id.* ¶9.)

Because the present motion concerns relatively narrow questions of law, there is no need to delve into the details of the NRDC's factual allegations. Its enough to say that the NRDC contends that BP's modifications will result in increased emissions of a variety of hazardous pollutants. (*Id.* ¶1.) The NRDC believes that IDEM was duped into giving BP the minor source permit because BP's application contained incorrect statements regarding the extent of the emissions from the expanded refinery. (*Id.*) Relying on that minor source permit, BP has begun construction of a $4 billion expansion to its facility. (*Id.*) The NRDC says that the changes BP is making to the Whiting facility trigger the requirements of parts C and D, which would require a major source permit. (*Id.*) The NRDC says this violates the Clean Air Act because it is modifying the refinery without the required major source permits. (*Id.*)

The NRDC also contends that BP actually began the modifications to its refinery in 2005, and that it did so without any permits whatsoever. (*Id.* ¶2.) BP's 2005 work involved its expansion of a fluidized cracking unit, which the NRDC contends was really the beginning of modification of the refinery to process the Canadian heavy crude oil. (*Id.*) Evidently, the EPA also has concerns that BP jumped the gun because in November 2007 it issued a notice of violation (NOV) finding that BP's 2005 fluidized cracking unit modifications were unlawfully commenced without a permit. (*Id.*) Then on October 1, 2008, the EPA amended its NOV to state that BP's 2005 modifications were actually the initial phase of its overall modifications to facilitate the processing of the Canadian extra heavy crude. (*Id.*) Thus, the amended NOV alleges that BP's 2005 modifications – and indeed its entire modification project – required a major source permit. (*Id.*) As a result, the NRDC says that BP should be liable for civil damages stemming from the period in which it was modifying its facility without a permit.

The NRDC's complaint contains three counts against BP. Counts I and III concern the NRDC's claims that BP failed to obtain major source permits (under both parts C and D, depending on the particular pollutant) for its Canadian extra heavy crude project. (*See* DE 38 ¶¶50-80 & 88-96.) The NRDC seeks a declaratory judgment that BP has violated the Clean Air Act and an injunction preventing BP from carrying out its modifications until it has obtained the appropriate major source permits. The third claim (Count II) alleges that BP's 2005 modifications were also major modifications that required parts C and D permits, but were commenced without any permit at all. (*See id*. ¶¶81-87.) The NRDC seeks a civil penalty from BP for this violation. (*Id*., Prayer for Relief ¶3.)

As noted above, there are other concerned citizens and environmental groups currently challenging the IDEM's decision before the OEA. (*See* DE 45-3 ¶¶1-5.) The OEA petitioners include the Sierra Club Inc., which is, like the NRDC, a national environmental organization whose "purpose is to protect the natural environment and promote the responsible use of the earth's ecosystems and resources. . . ." (*Id*. ¶2.) Although the NRDC advocated against BP getting the permit from IDEM, for one reason or another, the NRDC decided not to sign on to the petition appealing IDEM's decision to the OEA. A cynic might conclude that the NRDC and its colleagues at the Sierra Club were trying to fight the war on two fronts. The Sierra Club's petition before the OEA is a nearly identical to the NRDC's complaint in this Court. Indeed, other than the NRDC's claims in count II, the OEA petition covers the exact same ground. (*Compare* DE 38 *with* DE 45-3.)[1] What is more, even though the NRDC did not sign on to the

---

[1] The petition before the OEA also includes several allegations that the NRDC does not raise in this Court. (*See* DE 45-3 ¶¶70-72 (regarding BP's analysis for mercury and beryllium); ¶¶105-109 (regarding greenhouse gas emissions); ¶¶122-126 (regarding whether BP met all

OEA petition, it's attorneys represent the petitioners in that proceeding. (*See* DE 45-3 at 52-53.)

So it's not at all surprising that large chunks of the OEA petition and the NRDC's complaint are

identical – right down to the italics.

BP has moved to dismiss the complaint, arguing that 42 U.S.C. § 7604(a)(3) does not

give the Court jurisdiction, and that even if it did, the Court should abstain from exercising that

jurisdiction pursuant to the Supreme Court's decisions in *Burford v. Sun Oil Co.*, 319 U.S. 315

(1943), and/or *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976). (*See* DE

44 & 45.) I conclude that the Court has jurisdiction, but that it should not exercise that

jurisdiction, at least in part.

## DISCUSSION

### I.     The Civil Penalty Claim – Count II

Before plunging into the heart of this case, I will first dispose of the easiest issue. The

NRDC brings this action under the citizen suit provision of the Clean Air Act, 42 U.S.C. §

7604(a)(3). As discussed below, that provision provides for suits by private individuals against

parties that construct a major modification without a required permit. *See id.* Furthermore, the

statute specifically allows for suits seeking "appropriate civil penalties." 42 U.S.C. § 7604(a).

The NRDC alleges that BP commenced a major modification in 2005, and that it did so without

any permit whatsoever. (*See* DE 38 ¶¶81-87.) The NRDC therefore seeks civil penalties against

---

applicable requirements); ¶¶127-131 (regarding whether the IDEM permit is practically
enforceable).) In other words, putting count II to the side, the OEA petition covers everything
the NRDC raises in this case and then some. But even those factual allegations are included in
the OEA petition. (*See* DE 45-3 ¶¶77-86 (alleging that the minor source permit was
inappropriate because the EPA had already concluded that BP's 2005 actions constituted a major
modification).)

BP for this alleged violation of the Clean Air Act. To the extent the NRDC seeks civil penalties for the discrete period between 2005 and 2008 when BP obtained a permit from the IDEM, the Court clearly has jurisdiction. And the action presently pending before the OEA is not a bar to this Court exercising that jurisdiction. Even BP agrees with this. (*See* DE 57 at 15-17 (acknowledging that the Court has jurisdiction over count II and that it would not be improper to exercise it).) Therefore, even though I am dismissing counts I and III, I see no reason to dismiss the civil penalty claim in count II, and it survives this Order.

## II. Jurisdiction for Counts I and III

With respect to counts I and III, I must first assure myself that I have jurisdiction to decide the case. BP says I don't. (*See* DE 45 at 6-13.) It argues that, because it has a minor source permit, the NRDC's claims do not fit within § 7604(a)(3).

The Clean Air Act's citizen suit provision states, in pertinent part, that any person may bring a civil action on his own behalf

> against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3). The provision is intended to encourage citizen participation in the enforcement of the Clean Air Act. *See Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986). The section is clear: federal district courts have jurisdiction to hear citizen suits against parties that either construct or propose to construct an emission source that will emit pollutants beyond the specified thresholds under parts C or D, whichever is applicable, unless the party has first obtained the necessary permit.

11

According to the complaint, BP has both proposed to modify, and is in fact modifying, a major emitting facility. (*See* DE 38 ¶¶1-2, 42-49.) The complaint alleges that BP's modifications began in 2005, and that BP did not receive any permit whatsoever (part C, part D, or an Indiana minor source permit) for those changes. (*See id.* ¶¶42-43.) Although in May 2008, the IDEM issued BP a minor source permit for its modifications, BP still does not have a permit that satisfies parts C or D. (*See id.* ¶¶46-49.)

Based on the allegations in the complaint, this case falls squarely within the plain language of § 7604(a)(3). Assuming the allegations are true, BP's modifications to its refinery trigger parts C and D, but BP has not obtained the necessary major source permits to make those modifications.

BP's reliance on the Fifth Circuit's decision in *CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008), is not persuasive. In that case, TXU proposed to construct a coal-fired power plant and applied for a permit to do so. *Id.* at 470. The Texas agency charged with evaluating permit applications granted TXU a draft part C permit, and the citizen group sued to prevent the construction. *Id.* at 470-71. After the suit was filed, but before the Fifth Circuit's decision, the agency actually granted TXU the part C permit. *Id.* at 471 n.2. In affirming the district court's dismissal for lack of subject matter jurisdiction, the Fifth Circuit held that "§ 7604(a)(3) does not authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so." *Id.* at 479. The Fifth Circuit noted that

> Appellants interpret the phrase [in § 7604(a)(3)] "without a permit" to mean "without a permit that complies with the CAA." However, we decline to rewrite the plain language of the statute. Here, not only has TXU applied for a permit, it has since successfully obtained one, though still subject to state judicial review. Thus, it can hardly be said - as Appellants must in order for § 7604(a)(3) to apply - that TXU is proposing to construct or constructing a facility "without a permit."

*Id*. at 478-79 (footnote omitted).

While this language can be construed to support the broad interpretation of § 7604(a)(3) that *any* permit - even BP's state-law minor source permit - is sufficient to prevent an action, I do not think that is what the Fifth Circuit intended. Part of the plaintiff's theory in *TXU* was that the application contained faulty emissions information and therefore the part C permit that TXU obtained did not *actually* comply with part C because it was based on an incorrect analysis. *See CleanCOALition v. TXU Power*, No. 6:06-cv-355-WSS, Docket Entry 26 at 17-21 (W.D. Tex. May 21, 2007) (attached to BP's memorandum in support of its motion to dismiss [DE 45-5]). In essence, the *TXU* parties were arguing about whether the state agency was correct in the *type* of part C permit it granted. And the Fifth Circuit held the statute leaves that to the State to decide.

But if the broader interpretation is what the Fifth Circuit intended, I simply disagree. Section 7604(a)(3) does not say that a citizen suit lies when a party proposes a major modification "without a permit." Rather, the action lies when a party proposes a major modification "without a permit required under part C . . . or part D." Here, the NRDC says that's precisely what BP proposes to do here: to construct a major modification triggering parts C and D without the required permit under those parts. Thus, § 7604(a)(3) applies.

The fact that BP only has a state law minor permit, and not one required under part C or D, is what makes this case more like the Second Circuit's decision in *Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532 (2d Cir. 2004). There the court addressed a situation similar to what we have here: the plaintiff claimed that the defendant proposed to construct a major source of emissions, but it only received a state-law minor source permit. *Id*. at 534-35. The Second

Circuit essentially reviewed the allegations of the complaint and determined that they claimed the defendant proposed to construct a major emissions facility without a permit under parts C or D. *Id.* at 536. That was enough for jurisdiction. *Id.* "[A] state determination that a prospective source of air pollution is not a major emitting facility does not prevent a private plaintiff from bringing a suit seeking to enjoin the construction of the facility pursuant to . . . § 7604(a)(3)." *Id.* at 539. *See also Ogden Projects, Inc. v. New Morgan Landfill Co., Inc.*, 911 F. Supp. 863, 866-67 (E.D. Pa. 1996).[2]

In sum, I find that § 7604(a)(3) is clear, and the NRDC's allegations fall squarely within it. But just because there is jurisdiction to hear the case does not mean that I *should* hear it. That is where the NRDC hits an insurmountable hurdle.

## III. Abstention

Various abstention doctrines allow a court, in limited circumstances, to refrain from exercising jurisdiction. As a general rule, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). *See also New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 358 (1989) (*NOPSI*). But the duty is not "absolute." *Quackenbush*, 517

---

[2] BP thinks *TXU* and *Weiler* represent a circuit split with respect to jurisdiction. (*See* DE 45 at 9-10.) I disagree. As noted above, the issue in *TXU* was whether § 7604(a)(3) provided jurisdiction for a citizen suit when the applicant had obtained a part C permit, but the citizens group was unhappy with what the permit actually required. *Weiler*, on the other hand, dealt with an agency that simply said that no part C or D permit was required at all and instead granted a minor source permit under state law. The two do not conflict: in one there is a permit under part C and/or D, and in the other there is not. Nor does it not appear that the Fifth Circuit thought it was creating a split in deciding *TXU*. It cited *Weiler* approvingly, *see* 536 F.3d at 474, and declined to mention it in its analysis of § 7604(a)(3).

U.S. at 716.  The Supreme Court has "held that federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest."  *Id.* (quotation marks omitted).  *See also Colo. River*, 424 U.S. at 816-18.  Such interests include "considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration."  *Quackenbush*, 517 U.S. at 716 (quotation marks omitted).  Often "[f]ederal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism."  *Id.* at 723.

BP asserts that two types of abstention militate in favor of deferring to the Indiana state process in this case.  (*See* DE 45 at 13-21.)  The first is based upon federalism concerns, and arises out of the Supreme Court's decision *Burford*.  The second is based on considerations of judicial economy as outlined in *Colorado River*.  While *Burford* and *Colorado River* provide distinct frameworks for abstention decisions, the lines between them often blur.  This is why the Supreme Court has acknowledged, "the various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases."  *NOPSI*, 491 U.S. at 359 (quotation marks omitted).  Whether considered individually or in conjunction with one another, I think both types of abstention apply here.

### A.    *Burford* Abstention

*Burford* abstention grew out of the Supreme Court's 1943 decision, and is grounded in federalism, rather than concerns about the rights of the parties.  *See Int'l Coll. of Surgeons v. City of Chi.*, 153 F.3d 356, 361 (7th Cir. 1998).  In *Burford* the Court declined to exercise its jurisdiction to hear a challenge to a Texas Railroad Commission permit allowing the defendant

to drill for oil on its land.  319 U.S. at 316-17.  The Court noted that Texas had established the Commission in part to address issues related to oil extraction in the State.  *See Id*. at 318-20.  The Commission evaluated permit applications in the first instance, and its decisions were subject to review by the state district court in Travis County, as well as by the Court of Civil Appeals and the Texas Supreme Court.  *Id*. at 325-26.  Texas channeled judicial review through one county to assure uniformity.  *Id*. at 326-27.  In the judicial review procedure, the trial court determined whether the Commission acted reasonably, but also had authority to Order a trial *de novo*.  *Id*. at 326.  The Supreme Court concluded that abstention was necessary because "[t]he very 'confusion' which the Texas legislature and Supreme Court feared might result from review by many state courts of the Railroad Commission's orders has resulted from the exercise of federal equity jurisdiction."  *Id*. at 327.

What motivated the Court to abstain in *Burford* was the complexity of the issue, its importance to the State, the need for uniform regulation, the state procedures designed to prevent confusion, and the detrimental impact of ongoing federal review of the agency's orders.  *Quackenbush*, 517 U.S. at 725.  The Court made a similar point in *Colorado River* when it noted that *Burford* was concerned with the "disruptive effect" on state management of oil and gas fields that federal review would have.  *Colo. River,* 424 U.S. at 815.

Although there is no "formulaic test," *Quackenbush*, 517 U.S. at 727, the basic analysis for determining when abstention under *Burford* is proper has been refined by the Supreme Court as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the

16

result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*NOPSI*, 491 U.S. at 361 (quotation marks and citations omitted). *See also Quackenbush*, 517 U.S. at 726-27; *Ill. Bell Tel. Co., Inc. v. Global NAPs Ill., Inc.*, 551 F.3d 587, 595 (7th Cir. 2008).[3]

The first type of *Burford* abstention is not applicable here, because there are no "difficult questions of state law." The law is clear, and the thresholds for the respective permit requirements are plain. The question here is simply whether BP's plans surpass those thresholds. The second type of *Burford* abstention, however, may apply. The key question is whether the potential for conflict is so great "as to impair impermissibly the State's effort to effect its policy." *Colo. River*, 424 U.S. at 816.

Here, Indiana has acted to achieve its own environmental goals. While it was no doubt motivated to create its regime by the federal government's passage of the Clean Air Act, that does not take away the pressing state interests Indiana seeks to advance. At the federal government's request, Indiana developed its own plan and then sought, and obtained, the EPA's approval. *See* 72 Fed. Reg. 33.395. Furthermore, the Indiana General Assembly has made its goals explicit; it designed its regulatory regime to provide for "comprehensive environmental development and control [policies] on a statewide basis," and "to unify, coordinate, and implement programs to provide for the most beneficial use of the resources of Indiana," as well as to preserve the environment for future generations of Indiana citizens. *See* Ind. Code § 13-12-

---

[3] While abstention has its origins in equity, the Supreme Court has noted that abstention can be appropriate in any case "in which the court has discretion to grant or deny relief." *Quackenbush*, 517 U.S. at 718.

3-1.  In other words, in creating environmental regulations, Indiana has come up with a unique balance of economic, environmental, and natural resource allocation interests to best serve the people of Indiana.  It thus exercised its "wide discretion in formulating its plan."  *Union Elec.*, 427 U.S. at 250.  Unlike the states' role as an "ancillary enforcers" or a "deputized federal regulators" in, for instance the Telecommunications Act, *see Global NAPs*, 551 F.3d at 595 (quotation marks and brackets omitted), here Indiana is truly pursuing a local interest.

Indiana concentrates its technical evaluation of pollution permit applications in an expert agency.  The IDEM is vested with significant power, but is also reined in with detailed restrictions on the use of that power.  *See* Ind. Code § 13-11-1-1 *et seq.*  *See also* Ind. Code § 13-14-1-1 *et seq.*  The agency conducts its own expert analysis on the applications, and presumably does so seeking to achieve Indiana's environmental goals.  The IDEM's decisions can then be reviewed by another expert tribunal, the OEA.  *See* Ind. Code § 13-15-6-1 *et seq.*  Like the IDEM, the OEA utilizes its own expertise in evaluating appeals of the IDEM decisions.  This agency appellate review adds a layer of protection against erroneous IDEM decisions and helps maintain uniformity in the system.  Indiana then provides for review of OEA decisions in the state courts, including the Indiana Supreme Court.  *See* Ind. Code §§ 4-21.5-5-16 & 13-15-6-5. In sum, Indiana has devised a complex agency and judicial framework for evaluating permit applications that is designed to both provide expert analysis of the applications and maintain uniformity.

Finally, the substantive law applied within the Indiana regulatory regime is *state* - not *federal* - law.  Indiana uses its own thresholds for its permitting regime.  *See, e.g.*, 326 Ind. Admin. Code 2-2-1; 326 Ind. Admin. Code 2-2-3;  326 Ind. Admin. Code 2-3-1.  It even has its

own type of permit: the minor source permit, which is entirely a creature of state law. *See* 326

Ind. Admin Code 2-7-10.5. It is these regulations, not the federal regulations, that apply to

permit applicants in Indiana. *See* 40 C.F.R. 52.21; 72 Fed. Reg. 33.395; 62 Fed. Reg. 38.919.

*See also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 480-81 (6th Cir. 2004); *Sugarloaf Citizens*

*Ass'n v. Montgomery County, Md.*, No. 93-2475, 33 F.3d 52, 1994 WL 447442, at *4-7 (4th Cir.

Aug. 17, 1994). *See also Jamison v. Longview Power, LLC*, 493 F. Supp. 2d 786, 791 (N.D.

W.Va. 2007).

In the end, the NRDC wants me to second-guess the IDEM's expert application of

Indiana law with respect to BP's permit request. This is nothing more than a collateral attack on

the IDEM's permit decision. To allow it would be to gut the carefully crafted system that

Indiana has put in place. What is the point of having an expert agency appeals process - or a

state court appeals process - if litigants can simply side-step it by turning to the federal courts?

Take this case. There are multiple environmental groups fighting BP's permit tooth and nail.

While the some of them tussle with BP in the state system, the NRDC is trying to take BP to

federal court. But this gives the opponents of the permit multiple bites of the apple by allowing

them to fight the battle on two fronts. This strikes me as terribly inefficient. And if for some

reason this matter goes astray in the state system, the Clean Air Act provides for oversight by the

EPA. *See* 42 U.S.C. § 7413(a)(5). *See also Alaska DEC*, 540 U.S. at 473-74.

The bottom line is this: the NRDC thinks the IDEM got the call wrong. It may have. But

the proper remedy is through the Indiana regulatory and state court process; otherwise there is an

impermissible risk of disrupting the Indiana's attempt to ensure uniformity. *See NOPSI*, 491

U.S. at 362 (holding that abstention was inappropriate because the case was "[u]nlike a claim

that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors").  And while the issues may ultimately wind up in federal court again, if they do, then at least the federal court will have the benefit of the full state analysis.  But any attempt to litigate those issues here and now would smother the delicate federalism concerns that underlie *Burford*.  So I believe the best course is to restrain from exercising my jurisdiction.

My decision to abstain finds support in at least two appellate courts that have confronted the issue of abstention in the context of a challenge to a Clean Air Act permit that is simultaneously being challenged in the state agency process.  *See Ellis*, 390 F.3d at 480-81; *Sugarloaf*, No. 93-2475, 33 F.3d 52, 1994 WL 447442, at *4-7.  *Accord Jamison*, 493 F. Supp. 2d at 791.  The NRDC has not pointed me to a federal circuit court decision to the contrary. These cases hold that *Burford* abstention is necessary where a plaintiff is attempting to collaterally attack a state-issued permit.

In *Ellis*, for example, the court noted that the claims "boil down to allegations that the Kentucky agency failed to apply or misapplied its lawful authority under Kentucky law and under the Clean Air Act by issuing [a] PSD permit. . . ."  390 F.3d at 481 (quotation marks and brackets omitted).  The court found that *Burford* abstention was not only appropriate in such circumstances, but that the case offered "a classic explanation for applying *Burford* abstention" because allowing federal review would be disruptive to Kentucky's efforts to establish a coherent policy.  *Id*. at 480-81.

Likewise, the claims in *Sugarloaf* were described as a "collateral attack" on the state agency's permitting decision.  *See* 33 F.3d 52, 1994 WL 447442, at *4.  The complaint in that

case was "dressed in the raiments of federal claims," but did "nothing more than resurrect in a different forum objections . . . that have already been litigated before a state ALJ and the Secretary of [the state agency]." *Id*. at *6. The Fourth Circuit concluded that the citizens "cannot launch a grapeshot collateral attack on the permitting decisions of an agency [under the Clean Air Act] . . . and hope that [its shot] will land them in a federal district court." *Id*. (quotation marks and brackets omitted). Consequently, the Fourth Circuit concluded that abstention was "mandatory" because the exercise of federal jurisdiction over the State agency's permitting decisions "would disrupt Maryland's complex statutory scheme and frustrate the State's efforts to establish a coherent environmental policy." *Id*. at *4-7 (quotation marks and citations omitted).

The parallels between these cases and the case before me are striking. Here, as in *Ellis*, BP's permit is being challenged both in the concentrated and comprehensive state process on the exact same grounds that the NRDC pursues in this Court. And, just like in *Sugarloaf*, the NRDC's actual beef is cloaked in federal claims in the hopes of providing a federal forum for litigation. But, as the Sixth Circuit said, the ultimate question posed here is not whether BP can ignore the Clean Air Act requirements, but rather whether the Clean Air Act requirements are even triggered by BP's proposed changes - i.e., whether a part C or part D permit is even required at all. I would also add to the Sixth Circuit's articulation of the issues this additional question: who in this context gets to decide? I conclude, as the Sixth Circuit did, that the state gets to answer that question first.

None of the cases that the NRDC points to command a different result. (*See* DE 47 at 19.) The first, *PMC, Inc. v. Sherwin-Williams Co.*, presented a fight over which of two private

parties should pay for clean-up costs for past pollution under CERCLA, 42 U.S.C. §§ 9607(a) & 9613(f)(3), RCRA, 42 U.S.C. § 6900 *et seq*., and the Illinois Contribution Act. *See* 151 F.3d 610, 613 (7th Cir. 1998). Crucial to the outcome of that case was the fact that Illinois had not initiated a "formal" proceeding, but had merely carried out informal actions to address the alleged violations. *See id*. at 618-19. Indeed, the Seventh Circuit even stated that where there is a parallel formal proceeding, "there may be room for applying the doctrines of abstention . . . in cases in which . . . the citizens' suit would disrupt" that proceeding. *Id*. at 619. Thus, because there is a formal state proceeding here, if anything the Seventh Circuit's decision in *PMC* supports abstention, not the other way around.

In the second case relied on by the NRDC, *Oregon State Public Interest Research Group, Inc. v. Pacific Coast Seafoods Co.* (*OSPIRG*), the court refused to abstain in a Clean Water Act claim on summary judgment. 341 F. Supp. 2d 1170, 1172 (D. Or. 2004). But as with *PMC*, there was no parallel state proceeding. Thus, the same concerns that I have here - interfering with Indiana's prescribed process - just weren't present in *OSPIRG*.

The last, *White & Brewer Trucking, Inc. v. Donley*, also does very little to advance the ball for the NRDC. 952 F. Supp. 1306 (C.D. Ill. 1997). There, the court declined to abstain in a RCRA case predominately for two reasons, neither of which apply here. *See id*. at 1312-13. First, the court specifically noted that "[i]t is because the RCRA citizen suit is exclusively a federal cause of action that this court finds *Burford* abstention to be inappropriate . . . [because] there can be no timely and adequate state court review of [the] RCRA claim." *Id*. at 1312. Here, in contrast, the exact same issues the NRDC presses here are also being pressed in the OEA, and therefore timely and adequate review is available via the state process. Second, the court

concluded that there would be no need "to delve into the intricacies of Illinois environmental law" because there was no dispute that permit violations had occurred. *Id*. at 1313. The court reasoned that its case was different than those its defendants relied on because in those cases "had the court not abstained, it would have been required to review the state's environmental permit process." *Id*. Because I view this case as really a collateral attack on the IDEM decision, it poses the precise problem that was absent in *White & Brewer*.

There is one last point that I need to address before leaving the topic of *Burford* abstention. There is a line of Seventh Circuit cases which hold that, for a federal court to abstain, the state forum "must be special - it must stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims." *Int'l Coll. of Surgeons*, 153 F.3d at 363 (quotation marks omitted). This channeling of review through a special forum allows the forum "to acquire a specialized knowledge of the administrative regulations and the . . . industry." *Prop. & Cas. Ins. Ltd. v. Cent. Nat'l Ins. Co. Of Omaha*, 936 F.2d 319, 322 (7th Cir. 1991). Furthermore, "[t]he ability to point to a specialized proceeding *is a prerequisite of, not a factor in*, the second type of *Burford* abstention." *Int'l Coll. of Surgeons*, 153 F.3d at 363-64. (quotation marks omitted; emphasis added).[4]

In *International College of Surgeons*, the defendants sought to demolish two buildings, but the City of Chicago denied their permit requests. 153 F.3d at 359. The defendants sought

---

[4] The presence of a specialized forum has been considered by other circuits to be merely "a factor" in determining whether *Burford* abstention is appropriate. *See, e.g.*, *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 704-05 (10th Cir. 1988). Until *Property & Casualty*, the Seventh Circuit also viewed the presence of a specialized forum as "a factor." *See, e.g.*, *Gen. Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 708-09 (7th Cir. 1991); *Hartford Cas. Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419, 425 (7th Cir. 1990) (citing *Grimes*).

review of the City's decision in state court, and the actions were removed to federal court. *Id.*

The defendants then asserted that the federal court should abstain from deciding the case and

remand it back to the state court. *Id.* at 360. The Seventh Circuit concluded that abstention was

inappropriate under the second prong of *Burford* for two reasons. *Id.* at 364. First, unlike in

*Burford* where review of the agency decision was channeled through a specific state trial court,

review of the Landmarks Commission's decisions could be conducted by any court of general

jurisdiction under Illinois Administrative Review Act. *Id.* Second, the trial court reviewed the

decision with a deferential standard of review, rather than the *de novo* review made by the Texas

trial court in *Burford*. *Id.* at 364-65. "Therefore, unlike the situation in *Burford*, the

administrative scheme at issue in this case does not recognize any specialized expertise in the

Circuit Court of Cook County; instead, it is the Landmarks Commission whose expertise on the

law and the facts deserves deference." *Id.* at 365.

The NRDC did not raise the specialized forum aspect of *Burford* abstention in its brief as

a basis for denying BP's motion. (*See* DE 47 at 16-22. *See also* DE 53.) Nor did the NRDC

raise this point at the oral argument. (*See* DE 57.) Because the NRDC did not raise the issue of

whether or not there is a specialized forum to adjudicate this claim in Indiana, the argument is

waived. *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002) ("A party waives any

argument that it does not raise before the district court.") (quotation marks omitted); *see also*

*Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir.

2007).

In any event, I believe that Indiana has sufficiently indicated its desire to create a special

forum to regulate and adjudicate its air pollution permit requests. It has created a special

administrative agency, the IDEM, with expertise in the field. It then channels appeals of the IDEM decisions to the OEA, who again applies its own expertise in evaluating the application in a *de novo* review. *See* Ind. Code §§ 13-15-6-3 & 13-15-7-1 *et seq.* So unlike *International College of Surgeons*, the IDEM's initial decision is not immediately reviewable by any state court. *See* 153 F.3d at 365. It first must go to the OEA for a *de novo* review. The OEA's review therefore "stand[s] in a special relationship of technical oversight or concentrated review," and consequently is the specialized proceeding necessary for *Burford* abstention under the Seventh Circuit. *Id*. at 364.

What is clear from the case law is that abstention is appropriate when the "federal forum threaten[s] to frustrate the purpose of the complex administrative system" established by a State. *Quackenbush*, 517 U.S. at 725. Inserting this Court into the current fray creates precisely that risk. And the risk is intensified here, where the NRDC raises the exact same issues in this Court that are presently before the OEA. In the end, when I conduct my "careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action," *id*. at 728 (quotation marks omitted), I am convinced that this is a prime case for *Burford* abstention.

### B.  *Colorado River* Abstention

Abstention under the *Colorado River* doctrine is also appropriate. Unlike *Burford* abstention, *Colorado River* is based upon "principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions." *Colo. River*, 424 U.S. at 817. It is instead based upon "considerations of wise judicial administration" and a concern for

the "comprehensive disposition of litigation." *Id.* (quotation marks and parentheses omitted). *See also Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004). The circumstances permitting this type of abstention are very limited. *See Colo. River*, 424 U.S. at 817-18. And so abstention is the exception. *See Clark*, 376 F.3d at 685.

The abstention analysis under the *Colorado River* doctrine is a two-part inquiry. *See Tyrer v. City of S. Beloit, Ill.*, 456 F.3d 744, 751 (7th Cir. 2006). "First, the court must determine whether the concurrent state and federal actions are actually parallel." *Id.* at 751 (quotation marks omitted). If they are, "the court must consider a number of non-exclusive factors that might demonstrate the existence of exceptional circumstances." *Id.* (quotation marks omitted).

Two suits are parallel for *Colorado River* purposes when "substantially the same parties are contemporaneously litigating substantially the same issues." *Id.* at 752 (quotation marks omitted). "[I]t is not necessary that there be formal symmetry between the two actions." *Id.* (quotation marks omitted). Therefore, "[a]mong other things, to determine whether two suits are parallel, a district court should examine whether the suits involve the same parties, arise out of the same facts and raise similar factual and legal issues." *Id.* In essence, the question is whether there is a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Clark*, 376 F.3d at 686 (quotation marks omitted).

Based on that framework, the NRDC's federal case against BP is parallel to the petition presently pending in the OEA. First, the parties in the two cases are substantially the same. Although the NRDC is not named in the OEA action, that is not necessary. *See id.* The NRDC rests its *entire* opposition to *Colorado River* abstention on the fact that it is not a party in the OEA litigation. But the NRDC is simply wrong that "[t]he relevant fact - and determining factor

26

- is that NRDC is not a party to that OEA proceeding." (DE 47 at 24.) Instead, "[p]arties with nearly identical interests are considered substantially the same for *Colorado River* purposes." *Clark*, 376 F.3d at 686. (quotation marks omitted). Focusing, as I must, "on the parties' litigation interests" in this suit and the OEA action, *id*., I conclude that they are substantially the same.

The petitioners in the OEA action are a mix of non-profit environmental groups and concerned citizens. (*See* DE 45-3 ¶¶1-5.) As discussed above, one of the petitioners, the Sierra Club Inc., is a national environmental group very much like the NRDC. (*See id*. ¶2.) What is more, the petitioners in the OEA action are even represented by the NRDC's counsel in this Court. (*See id*. at 52-53.) Given the similarities between the petitioners in the OEA action and the NRDC here, I have no difficulty finding that they have the same "litigation interests," and therefore are "*substantially* the same." *Clark*, 376 F.3d at 686 (emphasis in original).

Second, the two cases arise out of the same facts. Both actions challenge BP's proposed modifications to its Whiting refinery. (*Compare* DE 38 ¶1 *with* DE 45-3 at 2-3.) In particular, both allege that the IDEM erroneously concluded that BP's project required only a minor source permit. In fact, a paragraph-by-paragraph review of the NRDC's complaint and the petition in the OEA reveals that even the particular omissions that BP is alleged to have made in each case is nearly the same, if not word-for-word identical. (*Compare* DE 38 ¶¶53-67 *with* DE 45-3 ¶¶25-50 (regarding flaring emissions); DE 38 ¶¶68-72 *with* DE 45-3 ¶¶51-52 (regarding certain other omitted emissions); DE 38 ¶¶73-75 *with* DE 45-3 ¶¶59-62 (regarding the use of baseline emissions); DE 38 ¶¶76-77 *with* DE 45-3 ¶¶63-69 (regarding the emissions related to the feedstock); DE 38 ¶¶78-80 *with* DE 45-3 ¶¶73-76 (regarding BP's use of years in which it was

allegedly operating in violation of the Clean Air Act); DE 38 ¶¶88-96 *with* DE 45-3 ¶¶87-98

(regarding BP's use of PM10 data as a surrogate for PM2.5 in its NNSR analysis).)

Unquestionably, these two cases arise out of the same facts.

Finally, the two cases raise almost identical legal issues over whether BP's proposed

modifications trigger the major modification permit requirements. While the NRDC complaint

is cloaked in federal claims, the Seventh Circuit has repeatedly "held that two actions are parallel

where the underlying issues are the same, even if they have been repackaged under different

causes of action." *Tyrer*, 456 F.3d at 753 (quotation marks, brackets, and ellipses omitted). *See

also Clark*, 376 F.3d at 686-87. As I see it, the NRDC's case would have me examine precisely

the matters in question in the state suit. *See Tyrer*, 456 F.3d at 754. And it should come as no

surprise that the relief sought in both cases is essentially the same: to reject the minor source

permit that IDEM granted and force BP to obtain a major source permit instead. As a result,

there is "a substantial likelihood that the state litigation will dispose of all claims presented in the

federal case." *See Clark*, 376 F.3d at 686.

Having determined that the NRDC's complaint and the OEA petition are parallel, I must

now evaluate whether there are "exceptional circumstances" that justify abstention. *See Tyrer*,

456 F.3d at 751. The case law has provided a non-exhaustive list of ten factors to consider in

that determination. *See id.* at 754. Those factors are:

> 1) whether the state has assumed jurisdiction over property; 2) the inconvenience
> of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the
> order in which jurisdiction was obtained by the concurrent forums; 5) the source
> of governing law, state or federal; 6) the adequacy of state-court action to protect
> the federal plaintiff's rights; 7) the relative progress of state and federal
> proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the
> availability of removal; and 10) the vexatious or contrived nature of the federal
> claim.

*Id.* "[N]o single factor is necessarily determinative." *Id.* (quotation marks omitted). The factors are "to be applied in a pragmatic, flexible manner with a view to the realities of the case." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983). Nevertheless, the evaluation must be made "with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* at 16. When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. *Id.* at 28.

My evaluation of the factors leads me to conclude that *Colorado River* abstention applies here. At the outset, four of the factors, whether the state has assumed jurisdiction over property; the inconvenience of the federal forum; the existence of concurrent jurisdiction; and the availability of removal do not weigh in favor of a stay and therefore counsel against it. But those factors are overwhelmed by the remaining factors.

First, there is a very real threat of piecemeal litigation. This factor was "[b]y far the most important" to the Court in *Colorado River*. *See Moses H. Cone*, 460 U.S. at 16. As should be clear from my discussion of the parallel nature of these two actions, the two cases present nearly identical issues. While "the danger of piecemeal litigation does not turn on formal identity of issues," *Tyrer*, 456 F.3d at 756, even the formal identity of the issues here is close. Moreover, the threat of piecemeal litigation poses three distinct problems: it duplicates the amount of judicial resources necessary to resolve the dispute, *see Clark*, 376 F.3d at 687; it creates incentives for the parties to game the respective proceedings, *see Tyrer*, 456 F.3d at 756; and it presents the possibility of inconsistent or conflicting results, *see id*. The latter two create questions about "[t]he legitimacy of the court system in the eyes of the public and fairness to the

individual litigants." *Id*. at 756. All three of these problems exist here, and as a result this factor weighs heavily in favor of abstaining.

Second, the order in which jurisdiction was obtained and the relative progress of the two actions also weigh heavily in favor of abstaining. While "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions," *Moses H. Cone*, 460 U.S. at 21, it should be noted that the original OEA petition was filed before the first complaint was filed here. (*Compare* DE 10-6 ¶11 (listing May 19, 2008, as the filing date of the petition) *with* DE 1 (the original complaint filed in this Court, filed on July 9, 2008).) More importantly, the OEA action is significantly further along than the NRDC's action here. (*See* DE 45 at 19-20.) Discovery in the OEA action has long since closed, BP has produced a substantial amount of discovery materials, and the OEA has set the matter for a hearing in August. (*See id*.) By contrast, we haven't even gotten out of the starting gate. BP hasn't answered the complaint. Discovery hasn't even started, let alone concluded. In short, this case is likely a long, long way from over. Thus, the relative progress of the two cases weighs strongly in favor of abstaining.

Furthermore, the OEA is also fully capable of providing an adequate remedy. It has the power to vacate or modify BP's permit. It can make BP go back to the IDEM to seek a major source permit, as the NRDC thinks it should. In short, aside from the civil fines for the claims in Count II, the OEA can provide an adequate remedy in this case. And "[i]f there is merit to [the NRDC's claim] . . . there is not only substantial likelihood that the state litigation will dispose of all claims presented in the federal case, but virtual certainty." *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 702 (7th Cir. 1992) (quotation marks omitted)..

The remaining two factors also weigh in favor of abstaining. While the NRDC argues that federal law governs the outcome of this case, (*see* DE 47 at 18-19), that is not really the situation. As noted above, even though federal law requires Indiana to adopt a plan to effectuate the Clean Air Act, that state-law plan has been approved by the EPA and now governs the issuance of air pollution permits in Indiana. Evaluation of the NRDC's claims, including what should and should not be included in an application for a permit from the IDEM, must be made by reference to Indiana law. And the OEA and the Indiana courts are far better suited to make that evaluation. *See, e.g.*, *Clark*, 376 F.3d at 687-88.

I am also inclined to view the last factor - the vexatious or contrived nature of the federal claim - as weighing in favor of abstention. It seems clear to me that the NRDC and the OEA petitioners are essentially carrying out a divide and conquer strategy with respect to BP's proposed modifications. As noted above, the OEA petition and the NRDC's complaint are strikingly similar - even down to their italics. The NRDC's counsel in this case represents the petitioners before the OEA, and, according to BP, even told the media it was pursuing the OEA appeal, (*see* DE 49 at 9 n.11). But perhaps in an attempt to maximize their chances of success, the NRDC, who was active at the IDEM stage of the permitting process, (*see* DE 10-5), broke off from the other parties and decided not to put its name on the petition in the OEA. It instead brought this action. Yet it seems to me that given the NRDC's strategy of challenging BP's permit at every step – it is even pursuing its claims in the EPA while all of this is going on, *see* DE 45 at 20 n.14 – it is a stretch that it would refrain from appealing to the OEA (but still have its counsel on the case), and then come to this Court and say that *Colorado River* doesn't apply *only* because the "NRDC is not a party to that OEA proceeding." (DE 47 at 24.) The

convenience of that argument seems contrived, and it smells fishy to me.  So this factor also weighs in favor of abstention.

In sum, the NRDC's suit and the OEA action are parallel proceedings.  And my evaluation of the relevant factors leads me to the strong belief that extraordinary circumstances exist here.  Despite the starting balance being "heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone*, 460 U.S. at 16, I believe abstention under the *Colorado River* doctrine is appropriate.

## CONCLUSION

Unfortunately, abstention under *Burford* and *Colorado River* do not result in the same procedural conclusion.  Whereas under *Burford* dismissal is appropriate, in *Colorado River* abstention cases the court is to stay the proceedings, *see Selmon v. Portsmouth Dr. Condo. Ass'n*, 89 F.3d 406, 409-10 (7th Cir. 1996).  Because I conclude that both forms of abstention are appropriate here, I will dismiss counts I and III rather than stay them.

Thus, for the foregoing reasons, Defendant BP Products North America, Inc.'s Motion to Dismiss Amended Complaint or in the Alternative for a Stay of Proceedings [DE 44] is **GRANTED IN PART AND DENIED IN PART**.  As detailed in above, counts I and III are **DISMISSED**.

**SO ORDERED**.
ENTERED: June 26, 2009                          s/ Philip P. Simon
                                                PHILIP P. SIMON, JUDGE
                                                UNITED STATES DISTRICT COURT